UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRADLEY T. PETERSON,

                Plaintiff,

v.

RYAN SMITH, MATT BREWER,
BRYAN J. COZZAGLIO, CITY OF
WOODHAVEN, *et al*.

                Defendants.

Case No. 18-12838

Honorable Matthew F. Leitman

Magistrate Judge David R. Grand

_____/

## REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART DEFENDANTS RYAN SMITH, MATT BREWER, BRYAN J. COZZAGLIO, AND CITY OF WOODHAVEN'S MOTION FOR SUMMARY JUDGMENT (ECF No. 42)

*Pro se* plaintiff Bradley T. Peterson ("Peterson") commenced this 42 U.S.C. § 1983 action on September 12, 2018, against defendants the City of Woodhaven, Police Officers Ryan Smith and Matt Brewer, and 33rd District Court Officer Brian Cozzaglio. (ECF No. 1.) Now pending before the Court is a motion for summary judgment filed on behalf of all Defendants. (ECF No. 42.) Peterson filed a response (ECF No. 49) and Defendants did not file a reply.

For the following reasons, the Court **RECOMMENDS** that Defendants' motion for summary judgment **(ECF No. 42)** be **GRANTED IN PART AND DENIED IN PART.**

## I.    FACTUAL BACKGROUND

### A.    *Undisputed Facts*[1]

Although Peterson's complaint is extremely "bare bones" and somewhat difficult to

---

[1] As the motion before the Court seeks summary judgment, the focus must be on those facts which are *undisputed*. Thus, whereas Defendants present some of the most salient "facts" from their own point of view, ignoring Peterson's contrary testimony and other evidence, the Court will provide a fair discussion of the undisputed facts, and will then highlight matters that are disputed.

decipher, the basic factual background of this case is fairly straightforward, aided to some extent by the existence of video evidence.  Peterson's claims arise out of events that took place at the 33rd District Court on April 12, 2017, and his subsequent arrest and prosecution.  On that date, Peterson accompanied his friend, Michelle Trueblood, to her sentencing hearing on a child endangerment charge in the 33rd District Court in the City of Woodhaven.  (ECF Nos. 42-2; 42-10, PageID.473-74.)  Trueblood had previously pled guilty, but she wanted to withdraw that plea claiming she had entered it under duress.  (*Id*.)  Judge McNally called her case at 9:40 a.m., and denied her motion to withdraw her guilty plea.  (ECF No. 42-2.)

<em>i.     Peterson's Conduct at Trueblood's Hearing</em>

The video surveillance of the hearing before Judge McNally shows Peterson sitting at the back of the courtroom.  He stands up and sits back down once at the beginning of the hearing.  Then at 9:47 a.m., the video shows him stand again and walk to the door.  Then he sits back down again at 9:48 a.m.  Eventually, an officer escorts him from the courtroom at 9:49 a.m.  There is no audio on the surveillance video.  However, the separate audio recording from the courtroom reveals the concomitant verbal exchange.  About twelve minutes into the audio, the prosecutor is speaking about the plea.  About two minutes later, the following exchange occurs:

> Judge:        Sir, sit down please.  You have to sit down, I said.
>
> Peterson:    I'm going out the door.  I want to get out of here.
>
> Judge:        Call the Court Officer.

(*Id*.)

About a minute later, there is a lot of inaudible whispering.  (*Id*.)  Then:

> Judge:        Leave the courtroom sir.
>
> Peterson:    Why?

2

| Judge: | Leave the courtroom or I will hold you in contempt. |
| Peterson: | You're full of crap.  She did it under duress. |
| Judge: | Sir, leave the Courtroom.  Call a court officer. |

At that point, a court officer escorts Peterson from the courtroom.  (*Id.*)  Video surveillance from outside the courtroom shows the two walking down the hallway.  (*Id.*)  Peterson appears somewhat agitated.  He is walking next to the officer shaking his head and gesturing with his hands.  He is then escorted out of the courthouse.

### ii.    *Peterson's Conduct outside the Courthouse*

Peterson then spends from 9:49 a.m. to about 10:00 a.m. pacing on the sidewalk in front of the courthouse.  The surveillance video from outside the courthouse appears to follow a loop wherein it changes its view in a clockwise rotation at mostly equal intervals, from the entranceway, to the right side of the entrance, to the street in front of the entrance, to the left side of the entrance. At around 10:02:40 a.m., the video seems to lock onto Peterson as he paces the sidewalk.  Peterson is using his arms to make sudden, somewhat aggressive gestures.

While Peterson disputes threatening any passersby while he was outside the courthouse, it is undisputed that a woman had entered the courthouse and reported to Court Officer Bryan Cozzaglio that Peterson was yelling that he loved Osama Bin Laden and ISIS, and that others, including a man named Robert Williams, reported to Cozzaglio that Peterson was yelling that he was going to shoot people. (ECF Nos. 42-5, PageID.391-94; 42-6.)  It is also undisputed that Cozzaglio placed the courthouse on lockdown and called the Woodhaven Police Department to request assistance.  (*Id.*)

At about 10:03:05 a.m., the surveillance video shows an officer (presumably, Officer Smith) approach Peterson.  The camera remains on the officer for about 20 seconds, then shifts

away suddenly, though the shadows of the two men standing there are still visible.  At 10:03:33 a.m., the officer steps toward Peterson and the camera view suddenly shifts, focusing on a nearby wall such that none of what happened next between the officer and Peterson is visible.

A few seconds later, the video pans down toward the sidewalk where two officers (presumably Smith and Brewer) are seen at what appears to be the very tail end of taking Peterson to the ground.  Peterson was laying on his stomach and the two offers were kneeling on top of him. The video stays on the officers and Peterson for about 12 seconds while they appear to restrain his hands behind his back.  Peterson appears not to be struggling, and the officers did not administer any punches or kicks.  The camera then resumes its clockwise rotation, and neither Peterson nor the officers are visible again until about two minutes later when Peterson is standing along side a police vehicle that is parked a few car lengths away from where the confrontation occurred.  An officer is seen gently pushing Peterson against the car.  At 10:06 a.m., the video shows Peterson getting into the car.  The officers continue to talk to other court officers and police officers.  At 10:14 a.m., the car with Peterson leaves the courthouse.

### iii.    Booking Room Video

In the booking room at the Woodhaven Police Department, the video shows Peterson walking in handcuffed with two officers.  (ECF No. 42-9.)  Peterson appears to be talking the entire time, but there is no audio to determine what he is saying.  One officer is responding to him. At some point, another officer enters the room, and the officer that was engaging with Peterson leaves.  A fourth officer takes his place and the booking is completed without incident.

### B.    Disputed Facts

The most hotly disputed facts concern the interaction between Peterson and Smith immediately before Smith's decision to engage physically with Peterson and take him to the

ground.

        i.     *Smith's Report*

Sergeant Smith reported that he and Officer Brewer were dispatched to the 33rd District Court "on a male subject who had been removed from Judge McNally's courtroom (at the [judge's] direction) for disruptive behavior." (ECF No. 42-4, Page.ID.383.) He also wrote that he had been advised that Peterson "had been yelling threats to civilians who were entering the court. He reportedly was making comments in support of ISIS and threatening to shoot people, specifically Robert Williams." (*Id.*) Then Smith reported the following:

> While dealing with Peterson in front of the court entrance, Peterson was highly agitated and was moving around as if he was getting ready to run from R/O. Upon approaching Peterson, I attempted to start a rapport with him. I asked him "whats going on", [sic] Peterson responded by saying "you tell me what the fuck is going on". I explained that I was asking what was going on because the police had been called on him regarding his behavior and the reported ISIS comments he had been making. Peterson became more aggressive at this time. I ordered Peterson to put his hands on top of his head in order to do a pad down for weapons. **He initially put his hands on his head but as soon as I began to pat him down, he quickly and without warning took his right hand off of his head and shoved it into his front right pants pocket as if to retrieve something.** I grabbed his arm and Ofc. Brewer gave loud verbal commands to remove his hand from his pocket. Peterson refused to comply and was henceforth put into a prone position until officers could determine what Peterson was retrieving from his pocket.
>
> Peterson refused repeated orders to put his hands behind his back. He locked out his elbows and physically struggled against officers who were attempting to control him. R/O was eventually able to get Peterson's left hand behind his back, but he continued to struggle with officers who were trying to get his right hand behind his back. While this altercation was unfolding, Peterson repeatedly called Officers "honkey mother fuckers" and other similar racially discriminatory names. At one point while resisting arrest, Peterson yelled, "how many n****s have you arrested today."

(*Id.*) (emphasis added.)

### ii.   Brewer's Report

Officer Brewer's patrol narrative indicates that he was dispatched to the 33rd District Court for "a report of a male causing a disturbance outside of the court."  (ECF No. 42-3, PageID.380.) According to Brewer, Smith was first on the scene, and ordered Peterson to put his hands on his head, but instead of doing so, **<u>"Peterson raised his hands and then dove into his right front pocket with his right hand in a manner that one would if retrieving a weapon."</u>**  (*Id*.)  Smith and Brewer then tackled Peterson to the ground.  (*Id*.)  Brewer continued to give Peterson loud verbal commands to place his hands behind his back and to stop resisting.  (*Id*.)  According to Brewer, "Peterson continued to resist officers by locking out his arms and refusing to put them behind his back."  (*Id*.)  After a short struggle, the Officers were able to handcuff Peterson.  (*Id*.) While being handcuffed, Brewer states that Peterson called the Officers "honkeys" and asked, "how many n****s have you motherfuckers arrested today?"  (*Id*.)

Brewer took Peterson to the Woodhaven Police Department.  (*Id*.)  He states that Peterson threatened him multiple times, stating, "I will find you and kill you[.]  I'll find your honkey ass on Facebook and then come to your house and kill every one of you[.]  You won't even see it coming honkey bitch[.]"  (*Id*.)  During the booking process Peterson allegedly stated several times that he was homicidal, and would kill people.  (*Id*.)

Brewer also reported that witnesses at the scene told him Peterson was threatening to "shoot the place up" and was yelling "I love fucking ISIS and I hope they kill more cops."  (*Id*.) Brewer wrote that Williams reported that Peterson told him, "I'm going to shoot you."  (*Id*.)

### iii.   Peterson's Deposition Testimony

Peterson is half Native American and half African American.  (ECF No. 42-8, PageID.430.)  Peterson admitted that he called the judge presiding over Ms. Trueblood's case an

"asshole"[2] during the hearing and that he was then ordered to leave the courtroom.  (*Id.*, PageID.432.)  Peterson also admits that after he exited the courtroom he was "talking out loud saying some things." (*Id.*, PageID.433.)  Although Peterson testified that he did not threaten to "shoot the place up," he also testified, "I don't know if I did or not" when asked if he said, "I love fucking ISIS and I hope they kill more cops," but later testified that if he did say those words, it was only to himself. (*Id.* PageID.433-34.)  Peterson also denied telling Robert Williams, "I'm going to shoot you." (*Id.* at PageID.434.)[3]  While Peterson testified that he doesn't recall what he was saying while outside the courthouse, he admits he was angry at the time. (*Id.*)

Peterson testified that when the police arrived at the court, Sergeant Smith walked up to him. (*Id.* at PageID.437.)  Peterson flatly denied that Sergeant Smith asked him to put his hands on his head. (*Id.* at PageID.438.)  Instead, Peterson testified that Smith asked him to produce identification, and that as soon as he attempted to get his identification out of his front pocket, Smith immediately took him to the ground. (*Id.*)  Peterson claims that he let Smith take him to the ground without resisting. (*Id.*)  He claims that while he was on the ground the officers put their feet and knees into his back, punched and kicked him, and called him "n****." (*Id.* at PageID.439-441.)  He also claims that after the incident, Officer Brewer took him to his squad car, and Sergeant Smith gave his buddies "high 5s." (*Id.*)  He admits that he probably called the officers "honkies," and asked, "how many n****s have you mother fuckers arrested today?" (*Id.* at PageID.443.)  He denies threatening the Officers' families. (*Id.* at PageID.444.)  Peterson testified that at the

---

[2] Peterson testified that he believed he had only been thinking this, but that his brother who was sitting next to him confirmed to him that he actually did say it out loud. (*Id.*, PageID.432; *see also id.*, PageID.455 ("sometimes I do slip up and I talk without really knowing . . .").

[3] Importantly, Peterson presented no evidence to rebut the fact that Williams made such a report to Cozzaglio or that Cozzaglio called for the Woodhaven Police Department because of reports he received regarding Peterson's conduct.

booking station, an officer ordered Brewer out of the room because Brewer was "provoking [him] and calling [him] boy and n****." (*Id*. at PageID.445.) He testified that he requested medical attention for his neck, but that it was denied. (*Id.*, PageID.447.)

Peterson alleges that the video of his confrontation with Sergeant Smith was tampered with, and that there is "an expert witness that gave testimony [in his criminal trial, presumably] that somebody did tamper with the evidence." (*Id*. at PageID.453.) At the end of his deposition Peterson stated that he was sober on April 12, 2017, but may have missed a dose of medication which could have accounted for some of his behavior that day. (*Id*. at PageID.455-56.)

  *C.* *Criminal Proceedings*

Following his arrest, Peterson was charged in state court with misdemeanor disturbing the peace under M.C.L. § 750.170, and with felony resisting and obstructing arrest as a habitual offender under M.C.L. § 750.81(d)(1). (ECF No. 42-7.) He was held in custody for 130 days. (ECF No. 42-8, PageID.447.) A jury found Peterson not guilty of the resisting and obstructing charge, but convicted him of the disturbing the peace misdemeanor charge. (ECF No. 42-8, PageID.449.) Peterson appealed his disturbing the peace conviction, with some success. The Michigan Court of Appeals held that Peterson's "public threats of violence are not constitutionally protected and that he could be properly convicted based on those threats." *People v. Peterson*, No. 348863, 2020 WL 6372358, at *1 (Mich. Ct. App. Oct. 29, 2020). However, the Court remanded the matter for a new trial because "the jury also heard substantial evidence of other statements made by [Peterson] that are protected speech, and the jury was not properly instructed." *Id.* The present status of Peterson's criminal case is unclear.

**II.** **Procedural Background**

On September 12, 2018, Peterson filed the instant action. The Court recognizes that

Peterson's claims are not well-defined in the complaint, and perhaps inartfully labeled.  However, careful review of his complaint allegations and deposition testimony clarifies that his most significant challenge is to his being detained pre-trial and prosecuted on the resisting and obstructing a police officer felony charge, which he claims was the result of fabrications by Smith and Brewer.  (*See e.g.*, ECF Nos. 1, PageID.12 ("The Defendants are continuing . . . false imprisoning the plaintiff on known false criminal felony charges, that was dismissed with prejudice on 9/12/2017."); 42-8, PageID.449 ("They was going to give me life [as a habitual offender] in prison for sticking my hand in my pocket"); *id.*, PageID.452 ("You try to give me life for sticking my hand in my pocket.")).  Accordingly, as the Court sees it, Peterson is asserting the following claims:  1) obstruction of justice against all Defendants; 2) unreasonable seizure against Smith and Brewer; 3) "false imprisonment" and malicious prosecution against Smith, Brewer and the City of Woodhaven; 4) excessive force against Smith[4]; 5) discrimination against Smith, Brewer, Cozzaglio and the City of Woodhaven; and 6) slander against Cozzaglio.  (ECF No. 1; ECF No. 42-8.)

With discovery closed, the Defendants now move for summary judgment on several grounds.  (ECF No. 42.)  First, they argue that there is no private cause of action for obstruction of justice under 42 U.S.C. § 1983.  (*Id.* at PageID.360-61.)  Second, they argue that Peterson's Fourth Amendment "false imprisonment" claim fails because Smith and Brewer had probable cause to arrest him and/or because their conduct in detaining and arresting Peterson was reasonable under the circumstances.  (*Id.* at PageID.361-67.)  Third, they argue that Peterson's discrimination claim fails because they arrested him for his erratic behavior, not his race.  (*Id.* at PageID.368-70.)  Fourth, they argue that Peterson has not alleged sufficient facts to state a claim against the City of

---

[4] Peterson's complaint contains no factual allegations as to any excessive force by Brewer.

Woodhaven under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). (*Id.* at PageID.370-73.) Last, they argue that Peterson's slander claim is barred by the applicable statute of limitations. (*Id.* at PageID.373.)

### C. Legal Standards

Pursuant to Rule 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at

558 (quoting *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989)). Indeed, "'[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.'" *Id.* (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)). "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.* at 560 (citing *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

### D.   Analysis

#### 1.   *42 U.S.C. § 1983 Claims Against Defendant City of Woodhaven*

A municipality may not be held vicariously liable for the actions of its employees under § 1983. Rather, it can be liable only when its official policy or custom directly causes the plaintiff's injury. *See Connick v. Thompson*, 563 U.S. 51, 60-62, (2011). This means that the plaintiff must establish that the action that is alleged to be unconstitutional "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978). *See also Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997) ("a plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."); *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (noting that under *Monell*, a plaintiff asserting a § 1983 claim "must demonstrate that the alleged federal violation occurred because of a municipal policy or custom"). To do this, the plaintiff must present sufficient facts to show "'a direct causal link' between the policy and the alleged constitutional violation such that the [municipal policy] can be deemed the 'moving force' behind the violation." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004) (citation omitted).

Under these standards, Peterson's attempt to assert a *Monell* claim against the City of Woodhaven clearly fails.  Peterson's complaint does not allege any *facts* regarding a specific policy by the City of Woodhaven that the defendant Officers were allegedly following when they engaged in the conduct Peterson complains about.  Nor, in response to the City of Woodhaven's summary judgment motion did Peterson present any evidence that the City of Woodhaven had a municipal custom or policy that caused any of its officers to violate his constitutional rights.  As such, the City of Woodhaven is entitled to summary judgment.

2. *42 U.S.C. § 1983 Claims Against Officer Brewer, Sergeant Smith and Court Officer Cozzaglio*

Officer Brewer, Sergeant Smith and Court Officer Cozzaglio assert that they are entitled to qualified immunity from Peterson's § 1983 claims.  (ECF No. 71, Page.ID.882-92.)  The doctrine of qualified immunity shields government officials "from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Once the qualified immunity defense is raised, "the plaintiff must show that (1) the defendant violated a constitutional right; and (2) that right was clearly established." *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016).  A plaintiff must satisfy both prongs, but the Court may take up the questions in either order.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Moreover, each defendant's liability "must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2019).

a. *Obstruction of Justice*

Peterson claims that Defendants obstructed justice by tampering with the video evidence from outside the courtroom.  (ECF No. 1, PageID.8.)  This claim (whether based on the alleged video tampering or any other conduct) is subject to dismissal for a few reasons.  First, there is no

12

constitutional private cause of action for obstruction of justice.  The federal obstruction of justice statute, 18 U.S.C. § 1503, "is a penal statute and does not create a private cause of action."  *See Raimondo v. Myers*, 04-74287, 2005 WL 2777001, * 3 (E.D. Mich. Oct. 25, 2005).  Second, despite *alleging* in his *complaint* that both Smith and Brewer "tampered with" "video-tape evidence" (ECF No. 1, PageID.8-9), Peterson now admits he does not know the identity of the person or persons who allegedly tampered with the video:

> A:   I want to be apologized for what they did to me, period.  I want the same rights that they would want to have, and plus they haven't even found out who tampered with the videotape.  I mean, he works for the State of Michigan, City of Woodhaven in the 33rd District Court building and he's tampering with videotape evidence?  He shouldn't be having a job there, period.  I don't care if he's white, black, yellow, brown.  If you are going to tamper with evidence –
>
> Q:   Who do you allege tampered with evidence?
>
> A:   **We don't know yet.  He's unknown.**  But there was an expert witness that gave testimony that somebody did tamper with evidence.

(ECF No. 42-8, PageID.453) (emphasis added).  Finally, Peterson has not provided this Court with the purported expert witness testimony he referenced at his deposition.  In short, Peterson has not raised a material question of fact that any of the Defendants tampered with the video evidence in this case.  For all of these reasons, Defendants are entitled to summary judgment on this claim.

>       b.      *Unreasonable Seizure, False Arrest, and False Imprisonment Claims against Defendants Brewer and Smith*

Peterson asserts that his arrest for resisting and obstructing arrest under M.C.L. § 750.81d(1) and disturbing the peace under MCL § 750.170 constituted "false imprisonment." (ECF No. 1, PageID.8-11.)  Peterson's complaint lacks any meaningful description of his claims, so it is not entirely clear what he means by "false imprisonment."  As the Honorable Amul R. Tharpar of the Sixth Circuit Court of Appeals recently explained, "false imprisonment" claims are

often improvidently named.  *Tlapanco v. Elges*, 969 F.3d 638, 660 (6th Cir. 2020) (Tharpar, J., concurring) ("While we're at it, we might want to stop using the 'false arrest' and 'false imprisonment' labels too.  The elements of common-law false arrest or false imprisonment are not a perfect match for a Fourth Amendment unreasonable-seizure claim (for instance, the required interference with liberty in false imprisonment is a 'confinement,' not a 'seizure').  []  For maximum clarity, we should simply call every unreasonable-seizure claim what it is: an unreasonable-seizure claim.").  This guidance notwithstanding, close inspection of Peterson's complaint and his deposition testimony makes clear that while he does assert an "unreasonable seizure claim" against the Defendants, his principal claims actually relate to the fact that he was detained and prosecuted on the felony resisting and obstructing charge.

As noted above, in his complaint, Peterson asserts that "[t]he Defendants are continuing . . . false imprisoning [him] on known false criminal felony charges, that was dismissed with prejudice on 9/12/2017."  (ECF No. 1, PageID.12.)  That allegation shows that Peterson's focus is less about what happened *at the time of his arrest*, and more about the fact that he *was detained in jail while he was being prosecuted on the felony charge* for resisting and assaulting a police officer, which charge he claims was based on false allegations by Smith and Brewer that he disobeyed Smith's order to put his hands on his head and then physically resisted their attempt to arrest him.  Peterson confirmed this interpretation during his deposition when he testified, "They was going to give me life [as a habitual offender] in prison for sticking my hand in my pocket" and "You try to give me life for sticking my hand in my pocket."  (ECF No. 42-8, PageID.449, 452.)  In sum, the Court views Peterson as having raised not only an "unreasonable seizure" claim, but also claims for false imprisonment and malicious prosecution.  Although Defendants addressed only the unreasonable seizure claim, the Sixth Circuit's recent published decision in *Howse v. Hodous*, 953

14

F.3d 402 (6th Cir. 2020), compels the Court to find that Defendants are entitled to summary judgment on all three claims.

### i.      Applicable Standards

"The right to be free from unreasonable searches and seizures is clearly established, *Graham v. Connor*, 490 U.S. 386, 392–93 [] (1989), and the reasonableness of a search or seizure is evaluated based on a totality of the circumstances, *Ohio v. Robinette*, 519 U.S. 33, 39 [] (1996)." *Greer v. City of Highland Park*, Michigan, 884 F.3d 310, 316 (6th Cir. 2018). Moreover, an officer may detain a suspect for investigatory purposes (a "*Terry* stop") when "specific and articulable facts which, taken together with rational inferences from those facts," *Terry v. Ohio*, 392 U.S. 1, 21 (1968), support a reasonable suspicion that the individual "has been or is about to be involved in criminal activity," *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993). Though more than a "hunch," reasonable suspicion "is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000). Again, "[r]eviewing courts must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing," and bear in mind that officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *United States v. Ellis*, 497 F.3d 606, 613 (6th Cir. 2007) (//internal citation and quotations omitted).

"In order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002). Probable cause to arrest exists if "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person . . . in believing . . . that the suspect has committed, is committing, or is about to commit an offense." *Steiger v. Hahn*, 718 F. App'x. 386, 390 (6th Cir.

2018)(citing *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).  Courts review this determination

from "the perspective of a reasonable officer on the scene, rather than [one] with 20/20 vision of

hindsight."  *Id*. (quoting *Klein v. Long*, 275 F.3d 540, 544 (6th Cir. 2001)).  Moreover, each

defendant's liability "must be assessed individually based on his own actions."  *Binay v.

Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2019).

The elements of false imprisonment are: (1) an act committed with the intention of

confining another; (2) the act directly or indirectly results in such confinement; and (3) the person

confined is conscious of his confinement.  *Hall v. Berrien Cty.*, No. 1:16-CV-1474, 2018 WL

3407694, at *3 (W.D. Mich. July 13, 2018) (citing *Moore v. City of Detroit*, 652 N.W.2d 688, 691

(Mich. Ct. App. 2002).  "To establish malicious prosecution, Plaintiff must establish the following

elements: (1) a criminal prosecution was initiated against Plaintiff and Defendants made,

influenced, or participated in the decision to prosecute; (2) there was no probable cause for the

criminal prosecution; (3) as a consequence of the legal proceeding, Plaintiff suffered a deprivation

of liberty apart from the initial seizure; and (4) the criminal proceeding was resolved in Plaintiff's

favor."  *Id.*, (citing *Johnson v. Moseley*, 790 F.3d 649, 654 (6th Cir. 2015)).  Moreover, the plaintiff

must demonstrate that Defendants acted with "some kind of blameworthiness, something beyond

mere negligence or innocent mistake."  *Johnson*, 790 F.3d at 655.

ii.    *Peterson's Unreasonable Seizure Claim Fails because Smith and Brewer
        Had Probable Cause to Arrest Him for Disturbing the Peace*

Defendants Smith and Brewer argue that they had probable cause to arrest Peterson for

disturbing the peace, in violation of M.C.L. § 750.170.  The Court agrees.  M.C.L. § 750.170

provides:

> Any person who shall make or excite any disturbance or contention in any
> tavern, store or grocery, manufacturing establishment or any other business
> place or in any street, lane, alley, highway, public building, grounds or park,

16

or at any election or other public meeting where citizens are peaceably and lawfully assembled, shall be guilty of a misdemeanor.

(*Id.*)

Black's Law Dictionary (4th Ed., 1951), p. 563, defines a disturbance as:

Any act causing annoyance, disquiet, agitation, or derangement to another, or interrupting his peace, or interfering with him in the pursuit of a lawful and appropriate occupation or contrary to the usages of a sort of meeting and class of persons assembled that interferes with its due progress or irritates the assembly in whole or in part.

*Id.*

"From the above definition it is clear that the statutory prohibition, framed in the disjunctive, embraces more than actual or threatened violence.... A disturbance, which is something less than threats of violence, is an interruption of peace and quiet; a violation of public order and decorum; or an interference with or hindrance of one in pursuit of his lawful right or occupation." *People v. Rice-White*, No. 350250, 2021 WL 220801, at *2 (Mich. Ct. App. Jan. 21, 2021).

Peterson has failed to raise a material question of fact as to Defendants' contention that they had probable cause to arrest him for violating this statute. There is no dispute that Peterson was disruptive in the courtroom and had to be escorted out by Chief Porath. Thereafter, he left the courthouse but remained just outside the entrance, pacing back and forth. While Peterson disputes making any threats to passersby, that is irrelevant to the question of whether the responding officers had probable cause to arrest him; what matters is what they were told prior to arriving on the scene and what they observed once there. A probable cause determination depends on whether, at the moment of arrest, "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 []

17

(1964).  The reviewing court must assess probable cause "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) (citation omitted). "[E]ven if a factual dispute exists about the objective reasonableness of the officer's actions, a court should grant the officer qualified immunity if, viewing the facts favorably to the plaintiff, an officer reasonably could have believed that the arrest was lawful." *Kennedy v. City of Villa Hills*, 635 F.3d 210, 214 (6th Cir. 2011).

Peterson has not raised a material question of fact that passersby reported to Court Officer Cozzaglio that Peterson was yelling that he was going to shoot people.  Nor has Peterson raised a material question of fact that as a result of those reports, Cozzaglio (1) called Woodhaven PD to request their assistance, and (2) placed the courthouse on lockdown.  Indeed, Brewer states that he went to the courthouse because of a "report of a male causing a disturbance outside of the court," and Sergeant Smith states he was dispatched "on a male subject who had been removed from Judge McNally's courtroom (at the judge's direction) for disruptive behavior.  (ECF Nos. 42-3; 42-4.) Peterson has presented no evidence that either officer had any reason to believe that the call requesting police assistance was unreliable.  Both Officers also said that Peterson was agitated when they arrived (*id.*), and their observations are corroborated by Peterson's admission that he was "angry" at the time, and video of him making sudden, somewhat aggressive gestures with his arms.

In sum, given all of the information the Officers had about Peterson's conduct, and the fact that it resulted in the courthouse being placed on lockdown, the Court finds that probable cause supported his arrest and charge for disturbing the peace.  Consequently, Peterson's unreasonable seizure claim fails as a matter of law. *Fridley*, 291 F.3d at 872.

iii.    *The Existence of Probable Cause for Disturbing the Peace Also Dooms Peterson's False Imprisonment and Malicious Prosecution Claims*

a.  *False Imprisonment*

The Sixth Circuit has held that where probable cause for an arrest exists, "claims for false arrest and false imprisonment fail because Michigan law does not treat them differently from the counterpart federal claims.  All turn on the same answer to the same question: Was there probable cause to arrest [the person]?  To prevail under state law, 'a plaintiff must show that the arrest was not legal, *i.e.*, the arrest was not based on probable cause.  If the arrest was legal, there has not been a false arrest or false imprisonment.'" *Seales v. City of Detroit, Michigan*, 959 F.3d 235, 243 (6th Cir. 2020) (quoting *Peterson Novelties, Inc. v. City of Berkley*, 259 Mich. App. 1, 672 N.W.2d 351, 362 (2003)).  Because the Court has found that Peterson's arrest was supported by probable cause, Smith and Brewer are entitled to summary judgment on Peterson's false imprisonment claim.  *Id.*

b.  *Malicious Prosecution*

Unfortunately for Peterson, although the Court finds that questions of fact exist as to whether probable cause supported the resisting and obstructing felony charge that was brought against him,[5] under *Howse*, 953 F.3d 402, the Court is compelled to find that Smith and Brewer

---

[5] M.C.L. § 750.81d(1) provides, "an individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers a person who the individual knows or has reason to know is performing his or her duties is guilty of a felony . . ."  One violates this law by, among other conduct, "the use or threatened use of physical interference or force or a knowing failure to comply with a lawful command."  M.C.L. § 750.81d(7)(a).  Defendants' contention that they had probable cause to arrest Peterson for violating this statute is based, impermissibly, on their own version of the facts.  They argue, "Defendants Smith and Brewer [] had probable cause to arrest Plaintiff for restricting [sic] and obstructing after he refused to comply with Defendant Smith's order to put his hands on his head.  Plaintiff continued to resist Defendants Smith and Brewer when they were attempting to handcuff him."  (ECF No. 42, PageID.365.)  However, Peterson flatly denied being instructed to put his hands on his head.  He was asked, "I want to know if [Smith] asked you to put your hands on top of your head?", to which Peterson unequivocally answered, "No, he didn't."  (ECF No. 42-

are entitled to summary judgment on his malicious prosecution claim.

In *Howse*, which is factually analogous to Peterson's case, Howse had gotten into a confrontation with a police officer outside his own home when the officer questioned why he was there. The officer eventually tackled Howse and arrested him. The officer asserted that Howse struck him during the confrontation. Howse admitted that he locked his arms to resist being handcuffed, but he denied striking the officer. Presumably based on the officer's testimony, a grand jury indicted Howse on two counts of assault and one count of obstruction of official business. But the charges were eventually dismissed, and Howse then filed a Section 1983 action asserting, among other claims, malicious prosecution. The trial court granted summary judgment to the defendants, and Howse appealed.

In affirming the grant of summary judgment on Howse's malicious prosecution claim, the Sixth Circuit held that when a person faces multiple charges, probable cause as to *any one* of the charges will defeat not only an unreasonable seizure claim related to his arrest, but also a claim for malicious prosecution as to *any* related charge for which he is prosecuted:

> To begin with, there's enough evidence for a reasonable person to believe that Howse obstructed official business. Someone obstructs official business when he acts with the purpose of obstructing or delaying an officer from performing a lawful duty and he actually hampers or impedes the officer. . . . Here, Howse himself admitted that he tried to make it more difficult for

---

8, PageID.438; *see also id.*, PageID.437.) Thus, a material dispute of fact exists on this issue. *Ciminillo*, 434 F.3d at 464. The Defendants' reliance on *Shreve v. Franklin County*, 743 F.3d 126, 132 (6th Cir. 2014), for the proposition that the "video evidence clearly contradicts [Peterson's] allegations," is unavailing because, as explained above, just before the physical altercation between Peterson and Defendants began, the video cut away from the men. Finally, the various Officers' reports are not entirely consistent as to this issue. For example, whereas Smith wrote that "[Peterson] **initially put his hands on his head** but as soon as I began **to pat him down**, he quickly and without warning took his right hand off of his head and shoved it into his front right pants pocket as if to retrieve something," Brewer made no reference to Peterson actually putting his hands on his head or to any "pat down" by Smith, and instead wrote that "Peterson **raised his hands and then dove into his right front pocket with his right** hand in a manner that one would if retrieving a weapon." (ECF Nos. 42-3, PageID.380; 42-4, Page.ID.383) (emphasis added).

the officers to arrest him by stiffening up his body and screaming at the top of his lungs. That's enough to provide probable cause for the obstructing-official-business charge.

And because there was probable cause for *that* charge, Howse cannot move forward with *any* of his malicious-prosecution claims. According to our circuit, malicious-prosecution claims are based on the Fourth Amendment. *Spurlock v. Satterfield*, 167 F.3d 995, 1006, 1006 n.19 (6th Cir. 1999). Although we call it a claim for malicious prosecution, that's a bit of a misnomer. After all, our circuit doesn't even require a showing of malice to succeed on such a claim. *Sykes v. Anderson*, 625 F.3d 294, 310 (6th Cir. 2010). It's really a claim for an "unreasonable prosecutorial seizure" governed by Fourth Amendment principles. *Id.* (cleaned up); *see also Gregory v. City of Louisville*, 444 F.3d 725, 748–49 (6th Cir. 2006).

Under the Fourth Amendment, an officer can seize someone so long as he has probable cause that the person has violated the law. For example, suppose a police officer clocks someone driving twenty miles per hour over the speed limit. The officer pulls over the driver and offers two reasons for the stop. The first is that he saw the driver speeding. The second is that he suspected that the driver might have illegal drugs. Even if there's nothing to support the officer's hunch about drugs, the officer still has probable cause to stop the car for speeding. *See Whren v. United States*, 517 U.S. 806, 811–13, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). So the seizure doesn't violate the Fourth Amendment even though one of the justifications for the stop was meritless.

That's why the constitutional tort claim of false arrest fails so long as there's just one valid reason for the arrest. A false arrest, as its name suggests, is simply an arrest which isn't supported by probable cause. *Webb*, 789 F.3d at 666. The Supreme Court has held that the reason the officer gives for an arrest need not be the reason which actually provides probable cause for the arrest. *Devenpeck v. Alford*, 543 U.S. 146, 153–55 [] (2004). If the facts known to the officers support probable cause in any form, then an individual may lawfully be arrested. *Id.* at 155 []. So it follows that when an officer arrests someone based on multiple charges, "it is not relevant whether probable cause existed with respect to each individual charge." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) (Sotomayor, J.). What matters is the validity of the arrest (the seizure) and not the validity of every charge (the potential justifications for the seizure). *Id.* As long as the arrest is supported by probable cause on one charge, then a false arrest claim cannot move forward. *See Alman v. Reed*, 703 F.3d 887, 900 n.3 (6th Cir. 2013); *see also Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017); *Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1095 (9th Cir. 2006).

The same rules apply here. After all, claims for false arrest and malicious

prosecution both arise under the Fourth Amendment. They both hinge on an alleged unreasonable seizure. And they both rise and fall on whether there was probable cause supporting the detention. Indeed, just like in the context of false arrests, a person is no more seized when he's detained to await prosecution for several charges than if he were seized for just one valid charge. In the end, there's no principled reason for treating a Fourth Amendment malicious-prosecution claim differently than a Fourth Amendment false-arrest claim.

Because there was probable cause to prosecute Howse for obstructing official business, he cannot proceed on his other malicious-prosecution claims.

*Howse*, 953 F.3d at 409-10 (emphasis in original).

Under this binding precedent, because the Court finds that because Smith and Brewer had probable cause to arrest Peterson for disturbing the peace, his malicious prosecution claim related to the resisting and obstructing charge fails. *Id.* Accordingly, Smith and Brewer are entitled to summary judgment on Peterson's malicious prosecution claim.

While this is the ruling compelled by *Howse*, the discussion would not be complete without recognizing the persuasive dissent in *Howse* authored by the Honorable R. Guy Cole, Jr.:

The Supreme Court tells us that the tort of malicious prosecution is "entirely distinct" from the tort of false imprisonment, which includes false arrest, as the former remedies the wrongful institution of legal process and the latter remedies detention in the absence of legal process. *Wallace v. Kato*, 549 U.S. 384, 390 [] (2007) (internal citation and quotation marks omitted). Here, the majority determines that these "entirely distinct" claims must necessarily be analyzed in the exact same way, despite myriad reasons to follow the Supreme Court's direction and treat them differently. And it does so *sua sponte*, absent the urging of any party, and without the support of a single decision of this court or any other. I decline to join the majority in making this leap to new legal ground.

We have never indicated that a malicious prosecution claim fails so long as there is probable cause to prosecute on one of several charges. In every prior case where there were some valid charges on the indictment and we were tasked to consider a malicious prosecution claim on acquitted charges, we separately analyzed whether probable cause supported the charge that was the subject of the claim. In *Barnes v. Wright*, we addressed a case where the plaintiff was convicted on the other charges for which he was indicted but

22

nonetheless brought a malicious prosecution claim concerning the charge on which he was acquitted. 449 F.3d 709, 713 (6th Cir. 2006). Rather than dismiss the matter immediately due to the existence of valid charges on the indictment, we undertook an analysis of whether probable cause supported the charge that was the subject of the malicious prosecution claim. *Id.* at 716–17. In *Cook v. McPherson*, we were similarly confronted with a case where the plaintiff had been convicted of all but one of the charges he faced in state court. 273 F. App'x 421, 422 (6th Cir. 2008). There, we affirmed the dismissal of the malicious prosecution claim because the plaintiff could not point to evidence that the indictment returned against him on the challenged charge had been obtained by fraud or other police misconduct, not because the plaintiff had been separately convicted on a different charge. *Id.* at 424.

Additionally, other circuit courts have explicitly rejected the majority's approach, and with good reason. The Second Circuit has concluded that a malicious prosecution claim can proceed even when a separate charge is supported by probable cause. *Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991). That court observed that the majority's approach would allow prosecutors to tack on additional meritless charges in any case where they had probable cause to prosecute for a single offense. *Id.* The Seventh Circuit held that "a malicious prosecution claim is treated differently from one for false arrest[.]" *Holmes v. Village of Hoffman Estate*, 511 F.3d 673, 682 (7th Cir. 2007). It aptly noted:

> An arrested individual is no more seized when he is arrested on three grounds rather than one; and so long as there is a reasonable basis for the arrest, the seizure is justified on that basis even if any other ground cited for the arrest was flawed. But when it comes to prosecution, the number and nature of the charges matters: the accused must investigate and prepare a defense to each charge, and as the list of charges lengthens (along with the sentence to which the accused is exposed), the cost and psychic toll of the prosecution on the accused increase.

*Id.* Other circuits have joined this conclusion. *See Johnson v. Knorr*, 477 F.3d 75, 83 (3d Cir. 2007) (declining to "establish legal precedent of such broad application that it would 'insulate' law enforcement officers from liability for malicious prosecution in all cases in which they had probable cause for the arrest of the plaintiff on any one charge"); *Uboh v. Reno*, 141 F.3d 1000, 1005 (11th Cir. 1998) (concluding that a malicious prosecution claim could proceed even when the plaintiff had already been convicted of other charges included in the same indictment).

I join these circuits and dispute the majority's contention that "there's no principled reason for treating a Fourth Amendment malicious-prosecution claim differently than a Fourth Amendment false arrest claim."

*Howse*, 953 F.3d 402, 415–16 (C.J. Cole, dissenting).

This Court's own research has uncovered numerous other out-of-circuit cases that have reached conclusions similar to Chief Judge Cole's.  *See, e.g., Miller v. Spiers*, 339 F. App'x 862, 867–68 (10th Cir. 2009) (noting that under the law of malicious prosecution, a "plaintiff [] [may] challenge prosecutions on a charge-by-charge basis."); *Holmes*, 511 F.3d at 682 ("[P]robable cause to believe an individual committed one crime—and even his conviction of that crime—does not foreclose a malicious prosecution claim for additionally prosecuting the individual on a separate charge."); *Elmore v. Fulton Co. Sch. Dist.*, 605 Fed. Appx. 906, 914-915 (11th Cir. 2015) ("probable cause as to one charge will not bar a malicious prosecution claim based on a second, distinct charge as to which probable cause was lacking."); *Lenhard v. Dinallo*, No. 1:08-CV-00165, 2011 WL 4592804, at *6 (N.D.N.Y. Sept. 30, 2011) ("Although probable cause is a complete defense to both false arrest and malicious prosecution claims, the existence of probable cause in each claim must be evaluated separately because 'the 'probable cause determination relevant to a malicious prosecution claim differs from that relevant to a false arrest claim.'' '[I]n a malicious prosecution action, the relevant probable cause determination is whether there was probable cause to believe the criminal proceeding could succeed and hence, should be commenced.'") (internal citations omitted); *Mazzetti v. Bellino*, 57 F.Supp.3d 1262, 1268 (E.D. Cal. 2014) ("That probable cause existed, or a conviction may have resulted, as to some charges does not preclude a plaintiff from pursuing a claim [for malicious prosecution] based on those charges to which no probable cause existed and to which there was a favorable termination.").

The competing points of view on this issue turn largely on whether a malicious prosecution claim like Peterson's should be considered under due process principles rather than unlawful seizure principles, with the *Howse* majority holding that in the Sixth Circuit the latter apply.

24

*Howse*, 953 F.3d at 409 n.2 ("A majority of the Supreme Court has not yet decided whether there is a cognizable claim for malicious prosecution under the Fourth Amendment.  Justice Alito, writing in dissent in *Manuel v. City of Joliet*, reasoned that malicious-prosecution claims do not arise under the Fourth Amendment. —— U.S. ——, 137 S. Ct. 911, 923, 197 L.Ed.2d 312 (2017) (Alito, J., dissenting).  If they are constitutionally cognizable at all, he said, they must arise under another constitutional provision—presumably the Due Process Clause.  *Id.*  But because our circuit has held that a federal malicious-prosecution claim does arise under the Fourth Amendment (and not the Due Process Clause), we are bound by that decision and must consider Fourth Amendment principles when defining the scope of the claim.") (citing *Sykes v. Anderson*, 625 F.3d 294, 310 (6th Cir. 2010)).  *Cf., e.g., Pierce v. Gilchrist*, 359 F.3d 1279, 1285–86 (10th Cir. 2004) ("The initial seizure is governed by the Fourth Amendment, but at some point after arrest, and certainly by the time of trial, constitutional analysis shifts to the Due Process Clause."); *Novitsky v. City of Aurora*, 491 F.3d 1244, 1258 (10th Cir. 2007) (noting that a malicious prosecution claim can be grounded in both the Fourth and Fourteenth Amendments).

While the ultimate issue is not before this Court, certainly, where a police officer lies in order to tack false charges on to a legitimate one, it seems quite unreasonable to absolve him from Section 1983 liability simply because the one charge was supported by probable cause.  In such a situation, the accused is subjected to a concrete, *incremental harm* – the additional emotional distress he feels knowing that his potential sentencing exposure is elevated as a result of the additional, trumped-up charges.[6]  *Holmes*, 511 F.3d at 682.  On the other hand, where probable

---

[6] Indeed, this is precisely the harm Peterson seems to be complaining about the most.  (ECF Nos. 1, PageID.12 ("The Defendants are continuing . . . false imprisoning the plaintiff on known false criminal felony charges, that was dismissed with prejudice on 9/12/2017."); 42-8, PageID.449) ("They was going to give me life [as a habitual offender] in prison for sticking my hand in my pocket"); *id.*, PageID.452 ("You try to give me life for sticking my hand in my pocket.")).

cause supports an arrest for one crime, an officer's seizure of the accused for some additional baseless reason does not cause him incremental harm because "[a]n arrested individual is no more seized when he is arrested on three grounds rather than one . . ." *Id.*, 511 F.3d at 682.  Respectfully, this strikes the Court as a "principled reason for treating a Fourth Amendment malicious-prosecution claim differently than a Fourth Amendment false-arrest claim." *Howse*, 953 F.3d at 409.

### c.   Excessive Force against Sergeant Smith

Peterson contends that Officer Smith used excessive force during his arrest.  (ECF No. 1, PageID.8.)  He states that Officer Smith "physically attacked him throwing him to [the] ground." (*Id.*)  Officer Smith states that his actions were reasonable under the circumstances.  (ECF No. 42, PageID.367.)  He argues that he "had been fully informed of Plaintiff's belligerent behavior prior to arriving on the scene, and had good reason to believe that Plaintiff posed an immediate threat." (*Id.*)  He further states that "[w]hen Plaintiff began reaching for his pocket after Defendant Smith told him to put his hands on his head, any reasonable officer would have believed that Plaintiff may have been reaching for a gun."  (*Id.*)

"[T]he right to be free from excessive use of force is a clearly established Fourth Amendment right." *King v. United States*, 917 F.3d 409, 429 (6th Cir. 2019).  However, "[n]ot every push or shove, even if it may later seem unnecessary . . .  violates the Fourth Amendment." *See Graham v. Connor*, 490 U.S. 386, 396 (1989).  To determine whether an excessive-force violation has occurred, courts apply "the objective-reasonableness standard, which depends on the facts and circumstances of each case viewed from the perspective of the reasonable officer on the scene and not with 20/20 hindsight." *Vanderhoef v. Dixon*, 938 F.3d 271, 276 (6th Cir. 2019).  An analysis of whether an officer's use of force was reasonable is guided by the following three

factors: (1) severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the police officers or others; and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight." *See id*. Considering these factors, and viewing the evidence in the light most favorable to Peterson, questions of fact exist which preclude granting summary judgment in Smith's favor.

First, Smith was called to the scene merely for a verbal disturbance;[7] nobody reported seeing Peterson with a weapon of any kind, and nobody alleged that Peterson had engaged in physical violence. Officer Smith initially attempted to speak with Peterson regarding the allegation that he was disturbing the peace. (ECF No. 42-4, Page.ID.383.) As stated above, what happened next is in dispute. Defendants contend that "Smith ordered [Peterson to put his hands up so he could pat him down for weapons" and that rather than doing so, Peterson "began to reach into his front pocket," causing Smith to fear he was reaching for a weapon. (ECF No. 42, PageID.364.) Peterson unequivocally disputes this version of events. Peterson denied that Smith asked him to put his hands on top of his head. (ECF No. 42-8, PageID.438; *see also id.*, PageID.437.) Instead, he claims that "Sgt. Ryan Smith walked up to [him] in front of court house and requested [his] I.D. card." (ECF No. 49, PageID.522; *see also* ECF No. 42-8, PageID.437-38.) Peterson claims that he "complied by reaching into his front right pocket for [his] I.D. card and Sgt Smith began to attack and throw [him] to [the] ground." (*Id*.) Peterson insists that he let Smith take him to the ground without resisting. (*Id.*)

---

[7] Although Williams testified that Peterson had told him, "I'll kill you" outside the courthouse, and that he reported that fact to Cozzaglio, Williams also testified that when he made that report, "there was cops already out there. They were already involved." (ECF No. 42-5, PageID.392.) This detail does not alter the probable cause analysis because Williams' comments were relayed to Smith and Brewer on the scene (ECF No. 42-3, PageID.380), but it does raise a question about what information the officers had at the precise time they engaged Peterson physically.

Thus, Peterson disputes that he was disobeying Smith's instructions or resisting arrest. (*Id*.)  Given these circumstances, there is a "triable fact" as to whether Smith's alleged use of force was reasonable under the circumstances; if Smith asked Peterson to put his hands on his head, and Peterson reached in his pocket instead, Smith was reasonable in tackling Peterson to the ground due to Peterson's failure to comply with a lawful command and the fear that Peterson had a weapon.  *See Vanderhoef, supra*.  If, on the other hand, Smith asked Peterson to get his identification, and Peterson reached into his pocket to comply, then Smith has not shown it was reasonable to tackle Peterson to the ground.  *Id*.

Additionally, Peterson testified that Smith punched him in the back of his head while handcuffing him.  (ECF No. 42-8, PageID.440.)  Unfortunately, as explained above, the video evidence does not entirely support either Peterson's version of events or Smith's version of events because the camera did not capture the operative exchange.  (ECF No. 42-2.)  Although the video contains a segment of the takedown and handcuffing, it cuts away both immediately before the takedown and prior to the completion of the handcuffing, such that the Court cannot say with any certainty that the video conclusively supports one side or the other.  The Court does note, however, that the portions of the video that are available do not show the punches alleged by Peterson.

In sum, questions of fact exist that preclude the Court from finding Smith is entitled to qualified immunity on Peterson's excessive force claim.  Accordingly, Smith's motion for summary judgment as to that claim should be denied.

> d. *Discrimination as to Sergeant Smith, Officer Brewer and Court Officer Cozzaglio*

Peterson alleges that Sergeant Smith "physically attacked him throwing him to the ground, assaulting him and [] tampered with known video tape evidence and obstructed justice to harm, hurt him, calling and labeling him a terrorist under arrest, out of bias, racism, discrimination,

prejudice [sic]." (ECF No. 1, PageID.8.)  He also alleges that Officer Brewer called him "n***, boy, terrorist" and "had to be removed by a commanding sgt. at the police station cause of his racist provoking statements and name calling." (*Id*. at PageID.9.)  He also alleges that Brewer "tampered with video-tape evidence to obstruct justice and harm, hurt and false imprison him out of racism, bias, discrimination, prejudice." (*Id*.)  Last, Peterson asserts that Court Officer Cozzaglio knowingly slandered him out of racism. (*Id*.)

Defendants contend that they reported and arrested Peterson due to his conduct, not his race. (ECF No. 42, PageID.370.)

The Equal Protection Clause of the Fourteenth Amendment prohibits purposeful discrimination in the enforcement of laws.  Selective enforcement of laws can lead to § 1983 liability if the plaintiff pleads purposeful discrimination. *See Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir. 2000).  The Sixth Circuit has established a three-part test for determining if race discrimination occurred as a result of selective enforcement of the law:

> First, [an official] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations.  Second, [the official] must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

*Id*. at 319 (quoting *United States v. Anderson*, 923 F.2d 450, 453 (6th Cir. 1991)).  "With regard to the first element, 'it is an absolute requirement that the plaintiff make at least a prima facie showing that similarly situated persons outside [his] category were not prosecuted.'" *Id*. (citing *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997)).  Peterson's discrimination claim is based on the theory that the Defendants selectively enforced Michigan's laws against disturbing the peace and resisting arrest against him because he was African American and Native American.

(ECF No. 1.)  However, he fails to present any evidence that the Defendants decided not to arrest persons not belonging to these protected groups in similar situations.  (*Id.*)  As such, although Peterson levels disturbing accusations against the Defendants, he cannot rebut their claim to qualified immunity.  *See Gardenhire, supra*;  *McDonald, supra*.  Therefore, Defendants' motion for summary judgment as to Peterson's discrimination claim should be granted.

e.  *Slander against Officer Cozzaglio*

Peterson seems to allege a slander claim against Court Officer Cozzaglio.  (ECF No. 1, PageID.9)  Although the complaint is unclear as to the basis of the claim, Peterson states in his deposition that Court Officer Cozzaglio's written report was false because he was inside the courthouse at the time of his arrest and could not have heard Sergeant Smith ordering him to put his hands on his head:

> So how did he hear anything?  He's making a statement that he heard something.  Either he got bionic ears or you got to have some type of electronic device inside the courthouse to be able to that they tampered with right here.  You know what I mean?

(ECF No. 42-8, PageID.436.)[8]

Defendants correctly note that in Michigan, the statute of limitations on a slander claim is one year.  M.C.L. § 600.5805(11).  Cozzaglio wrote his report on April 12, 2017.  (ECF No. 42-6.)  Peterson did not commence this action until September 12, 2018, which is five months beyond the limitations period.  (ECF No. 1.)  As such, Cozzaglio is entitled to summary judgment on Peterson's slander claim.

---

[8] The Court notes that nowhere does Cozzaglio indicate that he directly heard Smith speak these words.  (ECF No. 42-6, PageID.399.)  Instead, Cozzaglio appears to merely be reporting his understanding of what occurred.

## II.     RECOMMENDATION

For the foregoing reasons, the Court **RECOMMENDS** that Defendants' Motion for Summary Judgment **(ECF No. 42)** be **GRANTED IN PART AND DENIED IN PART**, as follows: summary judgment should be **GRANTED** as to all claims, except that as to Peterson's excessive force claim against Defendant Smith, summary judgment should be **DENIED**.


Dated: February 1, 2021                          s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                 United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.  A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record via email addresses the court has on file.

s/Eddrey O. Butts_____
EDDREY O. BUTTS
Case Manager

Dated:  February 1, 2021